UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:22-cr-065-CEA-SKL-1 |
| | ) | |
| JACKIE BAILEY | ) | |

## REPORT & RECOMMENDATION

Before the Court is an amended motion to suppress filed by Defendant Jackie Bailey [Doc. 37]. Defendant's motion seeks to suppress all evidence resulting from the search of his residence allegedly conducted pursuant to a protective sweep, a search of his same residence conducted pursuant to a search warrant obtained after the protective sweep, and all unmirandized statements made by him after his arrest. The United States of America ("Government") filed a response and supplemental response in opposition to the motion [Doc. 33 & Doc. 39]. Defendant filed a reply [Doc. 44].

In conjunction with the motion to suppress, I granted Defendant's motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, (1978), to challenge various alleged falsehoods in the affidavit submitted to establish probable cause for the issuance of the search warrant for Defendant's house [*see* Doc. 43]. The Franks hearing was held on June 22-23, 2023, and the parties submitted post-hearing briefs narrowing the issues [Doc. 51 & Doc. 52]. The motion to suppress is now ripe, and this matter has been referred for a report and recommendation by standing order pursuant to 28 U.S.C. § 636(b).

For the reasons stated below, I find Defendant has not met his burden to prove by a preponderance of the evidence that the affidavit at issue contains an intentionally false or reckless statement regarding the odor of marijuana emanating from the house. I also find the Government

has met its burden to prove the warrant was supported by probable cause and the search and custodial interrogation did not violate Defendant's constitutional rights.

## I.     FACTUAL BACKGROUND

The Government called former 12th and 31st Judicial District Drug and Violent Crime Task Force ("DTF") agent Dustin Brisher ("Brisher"),[1] and Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") agent Adam Baldwin ("Baldwin") as its witnesses.   Defendant called Deseria Sunderland ("Sunderland"), Corbin McGlamery ("McGlamery"), and Billy Bailey ("B. Bailey") as his witnesses.   The collective evidence credibly establishes the following pertinent facts.[2]

On March 21, 2022, Brisher, Baldwin, and various other federal and state law enforcement officers went to Defendant's residence on Graysville Road in Pikeville, Tennessee, to arrest him. Brisher's role that day was being a "perimeter secondary" who was there to prepare a search warrant if necessary since he was familiar with the area judges and the residence was in the area he worked "pretty hard."   Baldwin was the "evidence officer" responsible for taking photographs and documenting the event and evidence.   United States Deputy Marshal Jason Ladd ("Ladd"), who was not called to testify by either party, was leading the fugitive arrest operation.

Defendant had felony convictions and was wanted on a felony warrant from another state on drug charges.   During surveillance of the residence prior to their approach, officers saw Defendant walking in and out of the garage door entrance around several cars parked in the

_____

[1] Brisher is currently a lieutenant of corrections for the Texas Department of Criminal Justice. Based on the agreement of the parties, Brisher was permitted to testify in the Franks hearing by videoconference as he now resides and works in Texas.

[2] Apparently, there are no video or audio recordings of the events at issue.   However, there are numerous photographs of the house, entranceway, marijuana and other evidence, which were entered as exhibits by both parties at the hearing.

2

driveway near the entrance, which appeared to be the primary entrance to the house. Officers also saw a man and a woman, later identified as Sunderland and her husband, park their car at the residence, exit the car, and walk into the house through the garage door entrance. Officers then approached the house.

Brisher and Baldwin both testified that when they separately approached the residence to arrest Defendant from their different surveillance locations, they smelled a strong odor of marijuana emanating from within the residence. Both officers testified about the strong scent of marijuana detectable throughout the inside, and from the outside, of the residence. Much testimony was elicited regarding the officers' vantage points for detecting the odor of marijuana. Brisher, in effect, estimated he could smell marijuana from perhaps as far away as 30 feet. Baldwin testified he detected the "overpowering" odor of marijuana as he approached the garage door entrance near the vehicles. Baldwin said this did not contradict his testimony to the Grand Jury that he smelled the odor of raw marijuana emanating from the residence when knocking on the interior door inside the garage area.

Both officers testified regarding their extensive experience—and in Baldwin's situation, also training—with the detection of the odor of marijuana.[3] Neither officer recalled other strong

---

[3] For example, Baldwin can recognize the odor of both burnt and raw marijuana mostly through his law enforcement experience and some limited personal experience. He has worked on hundreds of investigations where he smelled marijuana and marijuana was found. In addition to smelling and then finding marijuana, he has attended three academies: a 12-week basic police officer training at the Federal Law Enforcement Training Center, a 12- to 13-week basic investigator school, and a 15- or 17-week ATF specific training to become an ATF agent. During this training, he was exposed to several lab and practical exercises that taught him to tell the difference between the odor of raw and of burnt marijuana. During cross-examination, Baldwin admitted he had no specific training or knowledge to detect the level of THC in marijuana or the distinction between the odor of legal CBD products and illegal marijuana. Baldwin also admitted he has never had his ability to detect odors tested.

odors allegedly associated with the garage and residence such as a motorcycle, fuel, lumber, or any smoking meat, detergent, burning candles, or cooking food.

As he first approached the residence, Brisher observed a handgun on the tire of a vehicle parked near the garage door entrance. For safety reasons, he removed the gun and its loaded magazine and placed it on the hood of a white vehicle so that other officers would know it was there. As Baldwin approached, he observed the gun on the hood of the white vehicle.

Ladd decided that because at least three people were known to be inside the residence and a gun with a loaded magazine was found near the entrance to the residence, the safer way to proceed was to knock on the door and request that Defendant surrender rather than making a forced entrance to arrest Defendant on the out-of-state arrest warrant. Officers entered the garage door and knocked on the closed door leading from the garage to the laundry room of the house. When there was no response from the house occupants, Ladd and other officers became concerned that the occupants might be barricading themselves in preparation for a confrontation. The occupants remained unresponsive for approximately 20 minutes despite further knocking and verbal commands by Ladd, which heightened the officers' safety concerns.

Prior to a response by any occupant of the house, Brisher left the scene in order to obtain a search warrant for the residence based upon the strong odor of marijuana emanating from, and the presence of a loaded firearm on the vehicle parked just outside of, the residence of Defendant, a known convicted felon. Officers at the scene anticipated that Brisher would be successful in his effort to obtain the warrant.

Finally, after about 20 minutes of continuous knocking and cajoling by the officers, the Sunderlands and Defendant separately exited the residence, and they were detained without further incident. While Defendant was being taken into custody, officers could hear scuffling noises from

4

within the residence.[4]  Ladd determined it would be prudent to conduct a "protective sweep" of the residence.   Officers entered the residence, briefly looked in all the rooms of the residence, and determined no persons remained inside who would pose a threat to them.

During the brief sweep of the house, officers saw what, in their experience and training, was thought to be a marijuana pipe, a methamphetamine pipe, plastic bags, and a black pistol. Baldwin, one of the officers in the sweep, testified he observed the black pistol in the bedroom in plain view.  Sunderland testified the gun was hers and that she had hidden it under a piece of furniture.[5]  Ladd called Brisher and advised that Defendant was in custody and officers had seen a marijuana pipe, a methamphetamine pipe, plastic bags, and a black pistol inside the house. Brisher, who believed the items were seen in plain view during Defendant's arrest, included the discovery of the pipes, bags and pistol in his affidavit in support of a search warrant ("Affidavit").

While awaiting issuance of the search warrant, but after the protective sweep, Baldwin advised the Sunderlands of their Miranda rights and spoke with them separately.   Both Sunderlands denied any knowledge of any firearms in the house, contrary to Sunderland's testimony during the hearing that the gun observed by Baldwin in the blue bedroom was hers.

After speaking to the Sunderlands, Baldwin advised Defendant of his Miranda rights, which Defendant waived.[6]  After waiving his rights, Defendant, who Baldwin described as very

---

[4] This was later explained by the presence of several dogs, including one or two large pit bulls and two small chihuahuas.

[5] Other than how it relates to credibility this factual dispute is insignificant because the Government has taken the position that all information viewed during the protective sweep may be stricken for purposes of determining probable cause for the issuance of the search warrant for Defendant's residence.

[6] As there was no proof to the contrary and Defendant no longer appears to be arguing he gave un-Mirandized statement, I **FIND** Defendant's Fifth Amendment rights were not violated and will not address this claim further.  *See McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019) ("A

5

compliant and cooperative, admitted he was selling 500 to 1000 pounds of marijuana on a monthly basis (Defendant later attempted to recant this admission to say he "could" sell that much marijuana), admitted he owned the firearm found outside, admitted he traded four ounces of marijuana for the firearm seen by Baldwin inside the residence, admitted he kept firearms because he had been robbed during prior drug deals, and said he was contemplating "suicide by cop," which is why it took a long time for him to exit the residence.

Brisher called to advise the on-scene officers that he had successfully secured a search warrant for the residence. Officers then re-entered the house and conducted a search. Baldwin took digital photographs during the search. About three pounds of raw marijuana and drug paraphernalia such as pipes and scales were found in the kitchen, which was the room on the other side of the laundry room door. The three pounds of raw marijuana included a small sandwich baggie of loose marijuana in a drawer and raw marijuana buds in Tupperware-type containers in a kitchen cabinet. Baldwin testified that, in his experience, the odor of marijuana could and did emanate from such containers and from vacuum sealed containers. Also in the kitchen refrigerator were eight jars of THC products. Baldwin did not recall any odor emanating from them.

It is undisputed a large amount of raw marijuana was found in the house. Most of the marijuana was found in vacuum sealed packages hidden inside a box in an air return vent that had a HEPA filter. Another vacuum sealed package of marijuana was found in another room of the house. Some marijuana was also found in a large piece of furniture near the sliding glass door at the rear of the kitchen area. Brisher estimated 40 to 45 pounds of marijuana was in the house,

---

party may not present a skeletal argument, leaving the court to put flesh on its bones."); *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("[J]udges are not like pigs, hunting for truffles[.]" (citation omitted)).

most of which was in vacuum sealed bags. The Government's questioning seemed to indicate somewhere between 20 to 30 pounds of marijuana was found in the house.

As noted, Baldwin testified he personally smelled a very strong order of marijuana emanating from what he believed were vacuum sealed bags, and that he has smelled marijuana from vacuum sealed bags in other cases as well. Brisher agreed that barriers such as doors, walls, and baggies can prevent the smell of a "substance" from escaping, and that distance to either raw or burnt marijuana plays a role in his ability to detect the odor of marijuana. Based on his extensive law enforcement experience with hundreds of cases involving marijuana, Brisher would have been "extremely surprised" if he and other officers did not smell the odor of marijuana emitting from the doorway of the residence given the quantity, packaging, and locations of the marijuana and the paraphernalia throughout Defendant's house. Moreover, Brisher was certain he independently detected the odor of marijuana as did other officers.

The search warrant has a time stamp of 7:47 p.m. on March 21, 2022. The parties seem to agree both the issuing judge and the residence are located in the central time zone. Some photographs of the evidence seized from Defendant's residence produced in discovery bear timestamps for a time allegedly prior to the execution of the search warrant.[7] Baldwin testified the timestamp set on the camera he used was inaccurate because the search was not begun until after Brisher called to notify the on-scene officers that the warrant had been signed. For example, Defendant's Exhibit No. 2 bears a timestamp of 7:29 p.m. on March 21, 2022, and Defendant's

---

[7] The many photographs taken that day and introduced into evidence during the hearing include photographs of the loaded pistol found outside of the house, the loaded pistol seen inside the house during the sweep, another pistol, ammunition, several pounds of marijuana, and jars of THC candies seized during execution of the search authorized in the warrant. The third gun was found hidden in Defendant's master bedroom air vent.

Exhibit No. 3 shows 7:30 p.m. Baldwin testified photographs were not taken during the sweep; instead, they were all taken after the warrant was signed. While Defendant's Exhibit No. 10 shows 7:32 p.m. on the timestamp, Defendant's bedside clock in Defendant's Exhibit No. 10 shows the time as 8:09.

Defendant's brother, B. Bailey, visits Defendant's house two or three times a month. B. Bailey testified that Defendant and their family always set the clocks using eastern time zone even though they live in the central time zone. Defendant's explanation via the testimony of his brother that he maintains his clock on eastern time does not explain the time difference between the clock and the timestamp—clearly one or both are set to the wrong time, whether in the eastern or central time zone. B. Bailey also never knew Defendant to sell marijuana, and he never saw or smelled marijuana inside Defendant's house.

Sunderland is a neighbor and friend of Defendant, and she has visited him at his house several times a week for about three years. She also does odd jobs, buys groceries, and cleans for Defendant. She and her husband arrived at Defendant's house around 3:00 to deliver him groceries. About 30 minutes later, while she and her husband were resting on a bed in the back "blue" bedroom, she heard the police knocking on the door and yelling for Defendant to come out of the house. In an affidavit she submitted in support of Defendant's motion for the Franks hearing, she swore the officers knocked on the door for 20 to 30 minutes before Defendant left the residence and that she and her husband exited the house shortly thereafter [Doc. 40-5].

During the hearing she testified the house smelled like laundry detergent/softener and candles and described the garage as smelling like fuel and lumber. None of these smells are mentioned in the affidavit she submitted in support of Defendant's motion for a Franks hearing; instead, her and her husband's nearly identical affidavits talk about the smell of a specific food

filling the house [Doc. 40-5 & Doc. 40-6]. Sunderland attributed the differences between her affidavit (executed June 5, 2023) and her testimony (given June 22, 2023) regarding the house odors to having a better memory at the time of her affidavit regarding the events taking place more than a year earlier on March 21, 2022.

Sunderland took the Fifth Amendment and refused to answer questions in cross-examination about how she became, and remains familiar with, the odor of marijuana since "childhood." She testified she never knew Defendant to sell marijuana, and never smelled or saw marijuana inside Defendant's house. She specifically testified Defendant's house did not smell like marijuana on the day at issue. She testified she would expect to be able to detect the odor of a large amount of marijuana if it was in Defendant's house. And she would be surprised if a large amount of marijuana was found in Defendant's house. Sunderland only ever saw "her" gun at the house, which is the one she hid under a piece of furniture in the blue bedroom before exiting on the day at issue.

McGlamery, who is 18, considers Defendant to be "basically his dad" and they have lived together for the last eight years except when Defendant has been in custody. McGlamery lived at the residence at issue for the last three years. He was called to the residence from his job the evening at issue to secure the dogs. He initially testified he arrived around 8:30 p.m., but when asked to clarify the time zone, he said he arrived at 8:30 eastern time/7:30 "central standard time." He was escorted into the house by officers. McGlamery did not see or smell any marijuana in the residence that day or on any other occasions. His prior experience with smelling marijuana occurred three to four years prior when, on two occasions, he rolled and smoked a marijuana joint. He described the house and garage as smelling like food and fuel and other normal household and garage smells. McGlamery also never saw any guns at the house.

Defendant is charged in a one count indictment with possession of a firearm by a felon [Doc. 1].

## II.     STANDARDS

The Fourth Amendment states, *inter alia*, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   U.S. Const. amend IV.   A defendant bears the burden of proof to show that a search performed pursuant to a warrant is unconstitutional.   *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).[8]

To pass Fourth Amendment scrutiny, the affidavit supporting the warrant application "must provide the magistrate with a substantial basis for determining the existence of probable cause." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).   To issue a warrant, a magistrate need only decide there's a "fair probability" that, given "all the circumstances set forth in the affidavit," the search will yield evidence of criminal activity.   *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Gates*, 462 at 218). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."   *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).   "[G]reat deference" is accorded to the issuing judicial officer's determination of probable cause.   *United States v. Burney*, 778 F.3d 536, 540 (6th Cir. 2015) (quoting *United States v. Greene*, 250 F.3d

---

[8] There are established exceptions to the Fourth Amendment prohibition against warrantless searches, including protective sweeps.   Because all warrantless searches are presumptively unreasonable, the government bears the burden of proving a valid exception applies whenever a warrantless search is conducted.   *See United States v. Jeffers*, 342 U.S. 48, 72 (1951) ("[T]he burden is on those seeking the [warrant] exemption to show the need for it.").

471, 478 (6th Cir. 2001)). Thus, review is limited to ensuring that the magistrate had a "substantial basis" for deciding probable cause existed. *Gates*, 462 U.S. at 236.

In deciding whether a warrant application contains sufficient facts to support a reasonable belief in probable cause, a court considers the facts set forth in the supporting affidavit and any facts presented to the issuing judge during the search warrant proceedings. *United States v. Frazier*, 423 F.3d 526, 535-36 (6th Cir. 2005). As there is no suggestion that any facts outside of the Affidavit were presented to the issuing judge in this case, the Court must decide probable cause by evaluating the information contained solely within the four corners of the Affidavit. *See United States v. Waide*, 60 F.4th 327, 337 (6th Cir. 2023) (holding that to determine whether a warrant was supported by probable cause, "we look only to the four corners of the affidavit.") (quoting *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016)); *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) ("In reviewing the sufficiency of the evidence supporting probable cause, [the court is] limited to examining the information contained within the four corners of the affidavit" in light of "the totality of the circumstances.").

However, "a search based on a warrant that contains deliberately or recklessly false allegations is invalid unless the remaining portions of the affidavit provide probable cause." *United States v. Charles*, 138 F.3d 257, 263 (6th Cir. 1998) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)); *see also United States v. Hammond*, 351 F.3d 765, 771 (6th Cir. 2003) ("The critical question to be determined is whether the affidavit, apart from the tainted information that is either inaccurate or illegally obtained, provides the requisite probable cause to sustain a search warrant.").

11

### III.    ANALYSIS

Defendant contends Brisher intentionally misrepresented in his Affidavit (and again in his testimony) that he and all other officers detected the odor of marijuana emanating from the residence.  Defendant argues that without Brisher's false statement regarding the odor of marijuana, the Affidavit does not establish probable cause for the search of his residence.[9]  The Government does not contend probable cause exists in the absence of Brisher's statement regarding the odor of marijuana; indeed, it has invited the Court to ignore all statements in the Affidavit regarding observations during the sweep and it has not argued probable cause exists based only on the discovery of the firearm on the vehicle parked at Defendant's residence.

As a result, the only issue before the Court is whether, in the Franks hearing, Defendant has met his burden to establish by a preponderance of the evidence that the challenged statement in the Affidavit was intentionally and materially false.  *See United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002) (The "court must strike from the warrant affidavit statements that the defendant can prove by a preponderance of the evidence to be both (a) materially false and (b) made with reckless or intentional disregard for their falsity.  If the redacted affidavit, purged of recklessly and materially false statements, no longer establishes probable cause, then the court must hold the resulting search warrant invalid." (footnote and citations omitted))); *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) ("He must show at the hearing, by a preponderance of the evidence, that false statements were made either intentionally or with reckless disregard for the truth and that

---

[9] Defendant does not dispute that more than twenty pounds of raw marijuana, drug paraphernalia, and guns were present in his house.  He also does not contest the validity of the arrest warrant, a warrant that would have provided officers the right to enter his residence had they chosen to do so before he voluntarily exited the residence and surrendered.  Likewise, he does not argue the officers were at an unlawful vantage point when they claim to have detected the odor of marijuana given the arrest warrant.

without these statements there is insufficient content in the affidavit to support a finding of probable cause. If he makes this showing, the evidence should be suppressed.").

In making this determination, the statements in the affidavit will be reviewed "in light of settled canons for the judicial review of warrant affidavit language." *Elkins*, 300 F.3d at 649. "Such affidavits are normally drafted by non-lawyers in the midst of a criminal investigation, and should be interpreted in a commonsense manner, not by imposing technical requirements of elaborate specificity. Minor discrepancies in the affidavit may reflect mere inadvertence or negligence, rather than the reckless falsehood that is required for exclusion." *Id.* "Warrant language may fall short of technical exactitude without necessarily violating the materiality and scienter requirements of *Franks*." *Id.* at 650.

A.    **Did Defendant Prove the Statement "*all Law Enforcement personal* [sic] *present, including your affiant could smell the distinct odor of Marijuana Coming from inside the residence*" is Materially False?**

Defendant focuses on the clause of the Affidavit that states "all Law Enforcement personal [sic] present, including your affiant could smell the distinct odor of Marijuana Coming from inside the residence." Defendant argues this clause intentionally, materially, and falsely represented that Brisher and every officer present, which he seems to argue includes officers conducting surveillance from whatever vantage place they were in, could smell marijuana emanating from the residence. Defendant attacks Brisher's credibility claiming he knew the statement was false not only because he did not speak with each of the many officers present, but also because he did not truly detect the odor of marijuana.

The complete sentence in the Affidavit, of which the first part is uncontested by Defendant, states: "While at the residence using what appeared to be the primary door attempting to talk Bailey out of the residence, all Law Enforcement personal [sic] present, including your affiant could smell

13

the distinct odor of Marijuana Coming from inside the residence." At the hearing, Brisher did not claim that he spoke with every officer on the scene. Instead, he testified the officers he spoke with, including Baldwin and two or three deputy marshals, said they also smelled marijuana. I **FIND** the complete sentence in the Affidavit, when fairly read in a commonsense manner as required, merely indicates all officers present at the doorway—Brisher, Baldwin and Ladd—could detect the odor of marijuana. True, there may have been other officers present (perhaps in vehicles or further away) who were not asked by Brisher if they could detect the marijuana odor from their vantage points before Brisher left to try to get a search warrant. However, the statement is not materially false, especially since Brisher knew Baldwin and deputy marshals also detected the marijuana odor as claimed in the Affidavit.

Brisher testified he has significant law enforcement experience and is familiar with the odor of marijuana. Baldwin testified similarly. Both testified about the distinctive odor of marijuana emanating from the house. Given that Brisher and Baldwin testified they could detect the odor as represented in the Affidavit, and Defendant presented no evidence to indicate Ladd did not also detect the odor of marijuana, the only germane remaining issue is whether Defendant has established both Brisher and Baldwin falsely testified they could detect the odor or marijuana emanating from the residence as claimed in the Affidavit.[10] Recognizing that it comes down to a credibility determination, Defendant relies on the testimony of Sunderland, B. Bailey, and McGlamery to argue the officers did, in fact, falsely testify because the only odors present from the officers' lawful vantage points were household and garage odors. This strong accusation fails.

---

[10] Defendant also attacks the testifying officers' ability to detect the odor of marijuana. Even if this attack succeeded, it would not necessarily prove the officers knew they were unable to detect the odor of marijuana.

14

A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the commonsense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)); *see also United States v. Solomon*, No. 13-40-ART-(5), 2015 WL 5474395, *4 (E.D. Ky. Sept. 17, 2015) (giving "great weight" to the credibility assessment of the magistrate judge, "who personally listened to the testimony of a witness" (quoting *United States v. Johnson*, No. 10-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011))). That there are some minor inconsistencies among the officers' testimony should be expected given the number of officers involved, the lapse of time, and the fast-moving circumstances. Were it otherwise, Defendant would likely argue the witnesses jointly concocted and rehearsed their testimony. I **FIND** any minor inconsistencies in Baldwin and Brisher's testimony does not render their testimony untrustworthy.

On the other hand, the inconsistencies in the testimony of B. Bailey, Sunderland and McGlamery render their testimony farfetched. Although they professed to be at Defendant's residence often, none of them had ever observed a gun or marijuana in the house even though it is undisputed that Defendant had guns/ammunition at the residence and a large quantity of marijuana in the house and Defendant admitted to dealing marijuana from his house. Given the guns, marijuana, and paraphernalia found in the residence that day, it is simply not credible that they never saw or smelled such evidence in any of their frequent visits to the home. Sunderland's testimony is also less believable because it strays from her affidavit and conflicts somewhat with

15

her recorded call with Baldwin.   Moreover, these witnesses are longtime friends or close family members of Defendant with an incentive to support his motion.

After considering all of the witnesses' appearance, demeanor, and descriptive account of the detection or absence of the odor of marijuana and assessing the inconsistencies in the witnesses' testimony and identifying the potential bias of each witness, I **CONCLUDE** Brisher and Baldwin testified candidly regarding their detection of the odor of marijuana emanating from the house.   Therefore, I **FIND** Brisher and Baldwin's testimony regarding their detection of the odor of marijuana emanating from the residence entirely credible.   As noted, the same cannot be said for Defendant's witnesses who claim to have not seen or smelled marijuana on the pertinent day (or ever at the house).

Brisher and Baldwin's testimony is also supported by the discovery of loose and packaged marijuana and other paraphernalia found in the house—despite Defendant's contrary arguments about vacuum sealed packaging and other barriers eliminating, or hindering the release of, a marijuana odor.   *See United States v. Rounsaville*, No. 1:17-cr-69-4, 2018 WL 4909903, at *8 (E.D. Tenn. Oct. 10, 2018) (finding that the eventual discovery of marijuana very near the place where officers were standing when they claimed to have smelled it bolstered the credibility of the officers' testimony as to plain smell); *United States v. Vaughn*, 429 F. Supp. 3d 499, 509 (E.D. Tenn. 2019) (holding that the magistrate judge did not err in finding officers' testimony about smelling marijuana credible where "a small amount of marijuana was found in the apartment, further supporting the officers' testimony.").

Defendant's cross-examination of the officers about the distinction between burnt and raw marijuana added little to the analysis.   *See United States v. Yarbrough*, 272 F. App'x 438, 443 (6th Cir. 2007) ("We fail to understand the relevance of this distinction.   Marijuana, whether burnt

16

or burning, is illegal and contributes to a finding of probable cause."); *United States v. Bohanon*, 629 F. Supp. 2d 802, 808 (E.D. Tenn. 2009) ("The crucial point is whether [the witness] smelled marijuana, not whether the marijuana had been burned or not, and [the witness] testified consistently on that point."), *aff'd*, 420 F. App'x 576 (6th Cir. 2011).

Attempting to support his suggestion that the testifying officers fabricated the marijuana odor in the Affidavit and then perjured themselves in the Franks hearing, Defendant also relies on a 2004 article by Professor Richard Doty, director of the Smell and Taste Center at the University of Pennsylvania School of Medicine ("Doty"), and Doty's testimony in an unrelated case. *See* Defendant's Exhibit 17 & Exhibit 18. To the extent Defendant is relying on this "evidence" to attack the officers' credibility or show it was *impossible* for an experienced officer to smell marijuana emanating from the officers' lawful vantage points, he failed to provide sufficient evidence to refute their testimony in what is a very fact-intensive inquiry. *See United States v. Thoms*, 788 F. Supp. 2d 1001, 1006-15 (D. Alaska 2011) (detailing Doty's study, including the large amount of evidence collected on weather and environmental conditions, on the sensory abilities and credibility determinations of multiple witnesses who had been near the marijuana grow operation, on the distance between the origin of marijuana odor and the investigator who smelled it, on the buildings and carbon filtration systems that would have blocked the smell, etc.), *vacated on procedural grounds and remanded*, 684 F.3d 893, 899 (9th Cir.2012). cajoling

Unlike the *Thoms* case, Defendant here presented no expert testimony as to the ability of the officers to smell marijuana from their vantage points. Even if I assume it was a windy, cool day as indicated by Sunderland, there is no testimony about the location of all the marijuana earlier that day or during the 20 minutes that Defendant remained inside the residence with the officers

17

knocking on the door.[11]   And, even if I also assume the main stash of some twenty pounds of marijuana, which was found hidden in an air vent in vacuum sealed bags behind a HEPA filter, was hidden there the entire day, no evidence was offered about the actual impact of a HEPA filter or the air-tightness of the other containers in the kitchen that contained some three pounds of marijuana, except that the officers could still smell the marijuana even though Defendant's friends and family swore they could not.   In contrast, the testimony in the *Thoms* case was very detailed concerning the filtration system, the physical location, the season and weather, and the claims that the odor was detected by law enforcement approximately 450 feet from the structure even though there was significant vegetation between the structure and the officer's location.

Without any supporting authority for such an application, Defendant essentially argues that the expert testimony in *Thoms* should be applied in this case (and, no doubt, other cases involving human detection of marijuana odors) to find Brisher and Baldwin's claim that they detected the odor of marijuana intentionally and materially false.   Yet, I cannot find a single case where Doty's testimony and study were given such weight.

Although not disclosed or discussed by either party, other courts have rejected Doty's testimony regarding the inability to smell marijuana because of his lack of knowledge of actual field conditions at issue.   *See United States v. Johnson*, 445 F. App'x 311, 312-13 (11th Cir. 2011) (holding district court did not clearly err in crediting police officer's testimony that he smelled marijuana when he removed a passenger from the defendant's vehicle, despite Doty's testimony that it would have been "next to impossible" for an officer to smell the marijuana inside a bag in

---

[11]  While not argued by the Government, there is also no credible evidence offered by Defendant that the marijuana was hidden where it was eventually found or in the containers and packages it was found in at the time the officers first detected the odor of marijuana or as they knocked on the door for 20 minutes to coax Defendant and others out of the residence.

18

the trunk of the car, because there was "[n]othing inherently unbelievable" about the officer's testimony); *United States v. Smith*, 694 F. Supp. 2d 1242, 1249-50 (M.D. Ala. 2009) (noting Doty "acknowledged that marijuana can leave an odor and so there is no way for his testimony to consider whether the vehicle had ever had other larger quantities of marijuana in it.")[12]. Moreover, courts have also rejected the claim that expert testimony about the inability to detect odors warrants a hearing to show that the law enforcement officer must have lied by claiming in a search warrant application to have smelled drugs. *See United States v. Mueller*, 902 F.2d 336, 341-43 (5th Cir. 1990); *United States v. Blair*, 493 F. Supp. 398, 413 (D. Md. 1980); *United States v. Viers*, No. Cr.04-60094-HO, 2005 WL 555397, at \*3-4 (D. Or. March 2, 2005); *State v. Edmark*, No. 51424-5-I, 2003 WL 22766035, at \*5 (Wash. Ct. App. Nov. 24, 2003).

Finally, to the extent Defendant is arguing that officers absolutely cannot detect the odor of marijuana unless they are within a few feet or inches of the substance, such an argument is contrary to decisions in this and other circuits discussing an officer's detection of raw marijuana. *See, e.g.*, *United States v. West*, 371 F. App'x 625, 627 (6th Cir. 2010) (as officer walked toward vehicle, she smelled a strong odor of unburnt marijuana coming from the vehicle); *United States v. Bettis*, 946 F.3d 1024, 1026 (8th Cir. 2020). Of course, it is commonsense that any claim officers could marijuana is more believable when the vantage point of the detection is near lots of marijuana, and less so when the vantage point is far away from small amounts with barriers in between. Just as this and other courts routinely consider facts such as proximity to, and amount of, marijuana in making its credibility decisions, I have done so here. In short, Defendant has not come close to showing the officers have perjured themselves.

---

[12] A transcript of Doty's testimony from *Smith* is Defendant's Exhibit 18. Although not addressed by the parties, it appears the district court rejected the testimony in *Smith* that Defendant seeks to apply here. *Smith*, 694 F. Supp. 2d at 1250, *aff'd*, 481 F. App'x 540 (11th Cir. 2012).

19

Moreover, Defendant does not dispute that the odor of marijuana coming from within a home establishes probable cause that the home contains evidence of a crime. *See, e.g., Vaughn*, 429 F. Supp. 3d at 508 (possibility "that the smell could have been hemp does not change the fact that it also could be . . . marijuana. The officers' detection of a marijuana odor meant there was a fair probability that marijuana would be found within the apartment, which is sufficient for probable cause."); *United States v. Porter*, 774 F. App'x 978, 979 (6th Cir. 2019) (holding probable cause to enter a residence existed in part because "while arresting Porter on the front porch of his free-standing home in a residential neighborhood in the very early morning, three officers smelled a strong odor coming from within the home and recognized it as the distinctive fragrance of marijuana, which is not permitted for medical or recreational use in Tennessee," reasoning the "total set of circumstances established at least a fair probability that the home contained evidence of a crime." (citations omitted)).

Although not argued by Defendant, for completeness I note that the Affidavit fails to address the officers' olfactory acuity, experience, and qualifications to detect odors of marijuana, but this failure does not change the outcome. *See, e.g., Rounsaville*, 2018 WL 4909903, at *7 ("If one reads an affidavit in a realistic and common-sense fashion, 'inherent in [an] officer's statement that he smelled marihuana' is that he is 'familiar with that substance's odor.'" (quoting *United States v. Ludwig*, 508 F.2d 140, 142 (10th Cir. 1974))) (citing *United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017) (holding the court was not aware of any case law that required "an officer to attest that he has specialized training in detecting marijuana's order before" his claims that he smelled it were given weight); *United States v. Carr*, 92 F. Supp. 2d 1137, 1141 (D. Kan. 2000) (holding officer's affidavit claiming he smelled marijuana emanating from defendant's apartment

20

supported probable cause for a warrant, even though the affiant did not attest to his training or experience with the smell of marijuana)).

Turning to the statements that remain after excising the evidence obtained during the sweep, the probable cause set forth in the Affidavit includes that Brisher and other law enforcement agents went to Defendant's residence to serve a Missouri arrest warrant on Defendant for possession of drugs.   In plain view, a black pistol was found on a vehicle parked at the residence. Law enforcement personnel present, including Brisher, could smell the distinct odor of marijuana coming from inside the residence.   Defendant did not immediately come out of the residence. After Brisher left to get a search warrant, Defendant came to the door and was arrested.   Defendant is a convicted felon with the most recent conviction in October 2017 in Lafayette County, Missouri, for sale and delivery of a controlled substance.   It is not a close call; and I **FIND** the four corners of the Affidavit provide ample probable cause because the officers could smell the distinct odor of marijuana coming from inside the residence as part of the totality of the circumstances.

B.  **Other Matters**

Although no longer directly at issue, for the record I will briefly address some arguments/evidence that might relate to credibility regarding the following statements in the Affidavit:

(1) **"On March 21, 2022 your affiant along with Deputies . . . went to the residence of 110 Graysville Road, Grasville [sic], TN. 37338 . . . "**

To determine whether a warrant describes with sufficient particularity the place to be searched, a court considers: "(1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly

21

searched." *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005) (quoting United *States v. Gahagan*, 865 F.2d 1490, 1497 (6th Cir. 1989)). It seems to be undisputed the correct address of the residence is *294* Graysville Road, not *110* Graysville Road. However, as argued by the Government, the physical description of the residence to be searched was adequately identified in the Affidavit and search warrant and there is no question that officers searched the right place. Moreover, two witnesses described issues with the home address on various internet maps. Defendant has conceded this minor discrepancy in the Affidavit need not be addressed further and I **FIND** it does not disprove credibility of the officers.

> **(2) "Your affiant found in Plain View laying on a car tire next to the primary door of the residence a black in color G43x pistol in a holster."**

Defendant claims the Government's documents are contradictory regarding the exact place where the pistol was found given the Report of Investigation states it was found "on the hood of a jeep near the back door of the residence." Brisher and Baldwin adequately explained the discrepancy and it remains undisputed that a black pistol was found on a vehicle parked next to the primary door used to enter and exit the residence. Defendant concedes he has not established a basis for striking this sentence from the Affidavit and I **FIND** it does not negate credibility of the officers.

> **(3) "After your affiant left the residence after some time Bailey opened the door to where he was placed into custody without further issue."**

Defendant claims there are contradictions in Government's reports regarding exactly where Defendant was arrested. While this statement in the Affidavit does not explicitly mention whether Defendant was arrested inside or outside of the residence, Baldwin's Report of Investigation ("ROI") states the accused was taken into custody after he exited the residence [Doc. 29-2 (Defendant "eventually exited the residence and was taken into custody without incident.")].

Even though there are disparities in word usage between the ROI and Affidavit, they are not contradictory. Furthermore, even if the arrest took place just outside the door, it would be immaterial and insufficient to discredit the statement in the Affidavit because the statement in the Affidavit allows for both possibilities, that is Defendant could have been arrested on either side of the door. In any event, Defendant concedes he has not established a basis for striking this sentence from the Affidavit and I **FIND** it does not refute the officers' credibility.

> **(4) "Deputy Marshal Jason Ladd contacted your affiant by Cell Phone and advised him while taking Bailey into custody they located in plain view in the residence where he was placed into custody a pipe used to smoke marijuana, a pipe with a white substance in it, several plastic bags, and another black in color pistol."**

Defendant claims there are several false declarations in this statement: (1) Defendant claims the arrest happened outside the residence; (2) Defendant claims the two pipes were found in a warrantless search, not a lawful protective sweep; and (3) Defendant claims the pistol was not found in plain view. The Government argues the protective sweep was justified but invited the Court to strike this language from the affidavit, arguing the Affidavit contains ample probable cause based on the odor of marijuana alone.

I agree with the Government that evidence viewed during the sweep may be excluded from the Affidavit without eliminating probable cause for the issuance of the warrant. As recognized by Defendant, if credited, the odor of marijuana alone would justify the issuance of the warrant as addressed above, so it is not necessary to address in detail Defendant's initial sweep arguments. In other words, it is unnecessary to address whether the circumstances provided a basis for the protective sweep, *i.e.*, the officers' warrantless intrusion into the home, which is the "chief evil" the Fourth Amendment guards against. *See Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks and citation omitted). Thus, the evidence viewed during the sweep of the residence has not been considered in connection with a determination of whether the four

corners of the Affidavit contain provable cause for the issuance of the warrant, but it has been considered in determining the witnesses' credibility.

### (5) Various Deductions

Defendant initially argued certain deductions or conclusions of the Affidavit, such as "Your affiant believes . . . [Defendant] is using the residence . . . as a drug-involved premise," and "Your affiant also believes that due to the fact that there was a firearm outside [Defendant]'s residence as well as a firearm Inside the residence there will be other firearms or paraphern[alia] associated with Firearms [Defendant] is forbidden to possess by state statue [sic]," were misleading and unsupported. However, he offered no support or argument that they were intentionally or recklessly false and should be stricken. As a result, there is also no need to address this initial argument further. Moreover, the statements appear to be entirely credible given the evidence presented in the Franks hearing.

## I.    CONCLUSION

For the reasons stated above, I **RECOMMEND**[13] that Defendant's amended motion to suppress [Doc. 37] be **DENIED**.

**ENTER**:

s/Susan K. Lee
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[13] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).